United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTINA GROTZ,<br><br>        Plaintiff,<br><br>        v.<br><br>KAISER FOUNDATION HOSPITALS, *et al.*,<br><br>        Defendants.<br>_____/ | No. C-12-3539 EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br><br>**(Docket Nos. 8, 14)** |

## I. INTRODUCTION

This case is filed under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq.*, and involves allegations of wrongful termination, breach of duty of fair representation, unlawful termination in violation of public policy, intentional infliction of emotional distress, and negligent infliction of emotional distress. Pending before the Court are two motions to dismiss. The first, filed by Defendant SEIU United Health Workers West ("UHW"), is directed at the only cause of action against UHW, for breach of the duty of fair representation. The second, filed by Defendant Kaiser Foundation Hospitals ("Kaiser"), joins UHW's motion to dismiss, and additionally moves to dismiss Plaintiff's claim for negligent infliction of emotional distress, and to strike portions of her claim for intentional infliction of emotional distress.

///

///

///

## II. FACTUAL & PROCEDURAL BACKGROUND

On July 6, 2012, Plaintiff filed a complaint alleging that she was terminated from her position as an admitting representative for Defendant Kaiser Foundation Hospitals in retaliation for complaints she had made about her supervisor. The complaint contains four causes of action:

(1) Unlawful discharge and breach of union's duty of fair representation. Compl. ¶¶ 24-33.

(2) Wrongful termination in violation of public policy. *Id.* ¶¶ 34-41.

(3) Intentional infliction of emotional distress. *Id.* ¶¶ 42-45.

(4) Negligent infliction of emotional distress. *Id.* ¶¶ 46-48.

Plaintiff originally named three defendants: Kaiser Foundation Hospitals ("Kaiser"); Kaiser's parent company, The Permanente Medical Group ("TPMG"); and her union, SEIU - United Health Care Workers West (UHW). On August 29, 2012, the Court approved a stipulated order dismissing TPMG, as it was not Plaintiff's employer in any relevant period.

Plaintiff worked as an admitting representative for Defendant Kaiser for almost 9½ years starting in February 2002. Compl. ¶ 7. At all relevant times, she was covered by a collective bargaining agreement (CBA) between UHW and Kaiser. Compl. ¶ 3, 25; Compl. Ex. 3 (excerpt of relevant parts of CBA). The CBA provides that "[n]o employee shall be disciplined or discharged without just cause." Compl. Ex. 3 at 117. Until the events at issue here, Plaintiff had never been disciplined or filed a grievance, and had "consistently received satisfactory evaluations." *Id.* At all relevant times, she reported directly to Debbie Taylor, the manager of the admitting department. *Id.*

Beginning around January 2008, Plaintiff and some of her co-workers began to have concerns that Ms. Taylor was using illegal drugs, and that said drug usage was having a negative impact on the workplace environment.[1] *Id.* ¶ 8. On twelve or more occasions, Plaintiff witnessed Ms. Taylor engaging in "suspicious behavior strongly indicating she was ingesting, using, and/or under the influence of drugs in the workplace." *Id.* On October 15, 2010, a union representative delivered a letter to detailing the concerns of Plaintiff and her coworkers to a TPMG administrator.

---

[1] The complaint states that the drug in question was "in all likelihood methamphetamine," but it does not indicate what made Plaintiff come to this conclusion. Compl. ¶ 8.

*Id.* ¶ 9. The letter, signed by Plaintiff and six of her coworkers, complained of a hostile work environment, retaliation, favoritism, and Ms. Taylor's suspected drug use. *Id.* It further stated that the employees had already utilized Kaiser's employee assistance program, and had notified both UHW and Kaiser's regional corporate compliance officers about these issues.[2] *Id.* Neither the letter nor the complaint in this case provide further detail about the allegations of hostile work environment, retaliation, and favoritism prior to the October 15, 2010 letter. *Id.*; Compl. Ex. 1.

In response to the letter, Kaiser initiated an investigation into the allegations on or about November 1, 2010. Compl. ¶ 10. To lead the investigation, it appointed Diane Keefer, admitting director and Ms. Taylor's direct supervisor, and Alan Burnett, a human resources manager. *Id.* During the course of the investigation, Plaintiff and others were called in for one-on-one interviews with Ms. Keefer and Mr. Burnett. *Id.* ¶ 11. The employees were assured that they would be immune from discipline or retaliation for participating in the investigation. *Id.* In Plaintiff's interview, she related an incident in which she had seen Ms. Taylor and another employee in Ms. Taylor's office snorting a white powder through rolled up dollar bills. *Id.* She also told Ms. Keefer and Mr. Burnett the names of two other individuals who had personally observed Ms. Taylor's drug use. *Id.* She told them that she believed Ms. Taylor generally obtained her drugs from other employees within the same Kaiser facility. *Id.*

On December 3, 2010, the two investigators convened a meeting with staff from the admitting department, senior leadership representatives from Kaiser, and a union representative. Compl. ¶ 12. At that meeting, the investigators claimed that there was insufficient evidence to substantiate the allegations of Ms. Taylor's drug use. *Id.* Plaintiff notes that this was contrary to the eyewitness testimony of multiple Kaiser employees. *Id.* She alleges the investigation was ultimately "biased and a sham," and that Ms. Keefer, who was apparently friends with Ms. Taylor, covered up for Ms. Taylor's drug use and joined in Ms. Taylor's efforts to intimidate Plaintiff. *Id.*

---

[2] The complaint does not actually allege that Plaintiff and her co-workers took these steps to raise their concerns about Ms. Taylor, only that the October 15, 2010 letter stated that they took the steps.

3

1   After this meeting, the matter was turned over to Kaiser's Employee Assistance Program
2   (EAP). Compl. ¶ 13. An EAP counselor held a meeting with Ms. Taylor, Plaintiff, and other
3   admitting department employees on January 27, 2011. *Id.* At one point during the meeting, the
4   EAP counselor asked Ms. Taylor to rate the department staff on trustworthiness on a scale of one to
5   ten, and she replied "zero." Compl. Ex. 2. During the course of this meeting, Ms. Taylor looked
6   Plaintiff in the eye and mouthed the words "you fucking bitch." Compl. ¶ 13. Though Plaintiff does
7   not otherwise describe the events at the meeting, she states that it was quickly aborted. *Id.* The EAP
8   counselor scheduled only one subsequent meeting with admitting staff; Ms. Taylor was not present.
9   *Id.*

10   Plaintiff states that to the best of her knowledge, Kaiser "did nothing further to remedy the
11   hostile working environment or address the illegal use of drugs by Tailor and others in the
12   workplace." Compl. ¶ 13. Elsewhere in her complaint, however, she notes that she was contacted
13   by Veronica Clements from Kaiser's regional human resources department in May 2011 as part of
14   an investigation into Ms. Taylor. *Id.* ¶ 21. Ms. Clements told her that the investigation was
15   triggered by an employee complaint. *Id.* Plaintiff relayed to Ms. Clements the concerns that
16   prompted the October 15, 2010 letter, as well as concerns about retaliation that had occurred after
17   the letter. *Id.* It is not clear whether anything came of this investigation.

18   After the October 15, 2010 letter, Plaintiff began to be the subject of various disciplinary
19   proceedings that she believes to have been initiated in retaliation for her complaints about Ms.
20   Taylor's drug use. She began to notice Ms. Taylor following her in the workplace for no apparent
21   reason. Compl. ¶ 16. She was accused of threatening Ms. Taylor, though the investigation of this
22   complaint was dropped for lack of evidence after about a month. *Id.* ¶ 14. In March 2011, Ms.
23   Taylor wrote her up for unprofessional conduct in relation to interactions she had had with another
24   Kaiser employee. *Id.* ¶ 15. Plaintiff alleges that this write up "was not based on facts, contained
25   false criticisms, and was retaliatory." *Id.* She appealed the write up through her union's process.
26   *Id.*; Compl. Ex. 2. Without first obtaining Plaintiff's permission, a union representative provided
27   Ms. Taylor with a copy of this appeal during a meeting with Plaintiff and Ms. Taylor on April 13,
28   2011. Compl. ¶ 17, 31. The union later urged Plaintiff to withdraw the appeal because it would

1  "start a big war" and could cause Ms. Taylor to accuse her of defamation. *Id.* Plaintiff refused to
2  withdraw the appeal. *Id.*

3  Also at the April 13, 2011 meeting, Ms. Taylor informed Plaintiff that she was being
4  investigated for an alleged timecard discrepancy on March 14, 2011. Compl. ¶ 17. An April 22
5  follow up meeting regarding these allegations was attended by Ms. Taylor, Ms. Keefer, Plaintiff and
6  four union representatives. *Id.* ¶ 18. At some point prior to the April 22 meeting, the union
7  representatives had told Plaintiff that she would be able to raise her concerns regarding retaliation
8  and Ms. Taylor's drug use in the meeting. *Id.* Shortly before the meeting, however, they changed
9  positions and told her not to bring up these concerns. *Id.* Plaintiff nevertheless stated in the meeting
10 that she felt the timecard allegations were retaliatory and related to her allegations about Ms.
11 Taylor's drug use. *Id.* The meeting became heated and Ms. Taylor and Ms. Keefer threatened to
12 charge Plaintiff with defamation. *Id.* At the close of the meeting, Ms. Keefer informed Plaintiff that
13 she was being placed on paid administrative leave. *Id.*

14 On May 5, Plaintiff, several managers and union representatives held a third meeting about
15 the timecard discrepancies. Compl. ¶ 19. At this meeting, Plaintiff explained that on the days in
16 question, she had had medical appointments that had been posted on the department schedule, and of
17 which Ms. Taylor had been aware.[3] *Id.* She stated that she believed that she had punched in and out
18 correctly on these days. *Id.* She was not permitted to see the documentation from the computerized
19 timecard system (TIMS). *Id.*

20 Still on administrative leave, Plaintiff met with Ms. Keefer, Mr. Burnett, and two union
21 representatives on July 7, 2011. Compl. ¶ 23. She was given a "last chance" agreement detailing
22 the findings of the investigation and setting conditions for her continued employment with Kaiser.
23 *Id.*; Compl. Ex. 4. The document stated that entries Plaintiff made into the TIMS system on three
24 occasions in March 2011 constituted "stolen time" and time fraud. Compl. Ex. 4. On each occasion,

---

[3] Plaintiff initially mentions one timecard discrepancy on March 14, 2011; later in the complaint she mentions "discrepancies" on multiple days, though she does not specify the other days, or mention when she found out that the investigation covered more than one potential discrepancy. The last chance agreement indicates that the alleged discrepancies occurred on March 14, 29 and 30 of 2011. Compl. Ex. 4.

she had left work for a medical appointment, and either failed to properly punch out, or had subsequently corrected her time cards in ways deemed inaccurate. *Id.* The last chance agreement stated that Plaintiff would be placed on five days unpaid administrative leave, and that she would have to follow certain detailed instructions to ensure that her TIMS entries were accurate during a one year probationary period. *Id.* At the meeting, the managers and union representatives urged Plaintiff to sign the document immediately, telling her she would be terminated if she refused to sign. Compl. ¶ 23. Plaintiff was not permitted to ask questions or discuss the document, which she felt contained inaccurate information. *Id.* She refused to sign and was terminated. *Id.* She later learned that Ms. Taylor had been terminated on the same day. *Id.*

In her complaint, Plaintiff states that Ms. Taylor had the ability at all relevant times to alter records in TIMS. Compl. ¶ 20. Plaintiff further states that she believes that she is the only person from her department ever terminated for timecard discrepancies, "despite the fact that such discrepancies happened on a regular basis in her department." *Id.*

Plaintiff protested her termination to UHW, which thereafter filed a "Step II" grievance on her behalf, requesting reinstatement.[4] Compl. ¶ 28; Compl. Ex. 5. There was a meeting regarding the grievance on an unspecified date, though Plaintiff's union representative told her that she was not permitted to speak at the meeting, and that her concerns around the October 15, 2010 letter would not be discussed. Compl. ¶ 28. After the meeting, the UHW informed Plaintiff that it would be filing a "Step III" grievance. *Id.* At some unspecified later time, Plaintiff was informed that the grievance had not been resolved at Step III, though she was not subsequently involved in any Step III meetings. *Id.* On January 12, 2012, a union representative informed Plaintiff "that her case had no merit," and that the UHW was withdrawing her grievance. Compl. ¶ 29. The representative offered no further explanation of why the UHW had concluded her grievance was without merit. *Id.* Under the collective bargaining agreement, the "grieving party" has 10 days to make a demand for

---

[4] The Collective Bargaining Agreement provides for a four step grievance process. Comp. Ex. 3 at 120-22. The first step involves informal discussions to attempt to resolve any issues. The second is a formal written grievance and response. The third step involves an appeal submitted in writing, a mandatory meeting, and a formal written response. The fourth step is binding arbitration. *Id.*

1  arbitration on after a grievance fails to resolve at Step III. Compl. Ex. 3 at 121. The UHW did not
2  make a demand for arbitration on Plaintiff's behalf within this time period. Compl. ¶ 29.
3      Plaintiff alleges that both Kaiser and the UHW were aware of Ms. Taylor's drug problems,
4  and knew that Plaintiff's complaints about Ms. Taylor spurred the retaliation that led to her
5  termination. Compl. ¶ 22.

### III.    DISCUSSION

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.2009). While "a complaint need not contain detailed factual allegations ... it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678.

A.    <u>Plaintiff's Claim for Unlawful Discharge and Breach of Duty of Fair Representation</u>

Plaintiff's first claim is a "hybrid" claim under the Labor Management Relations Act, alleging termination in violation of the CBA against Kaiser and breach of duty of fair representation against UHW. *See DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 163-65 (1983) (describing such hybrid claims). The claim against the Employer is under § 301 of the LMRA, which creates a federal right of action for breach of contracts between employers and labor organizations. 29 U.S.C. § 185. The LMRA does not explicitly provide for a cause of action against a union for breach of duty of fair representation. However, courts have interpreted Section 9 of the

7

LMRA, which provides that representatives selected by the majority of employees shall be their exclusive representatives for the purposes of collective bargaining, to create a duty of fair representation. *Simo v. Union of Needletrades*, 316 F.3d 974, 981 (9th Cir.2003) (interpreting 29 U.S.C. § 159(a)).

> As the exclusive bargaining representative of the workers, the union has "'a duty to exercise [its] power in their interest and behalf.'" "[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.'" "The duty of fair representation is thus akin to the duty owed by other fiduciaries to their beneficiaries."

*Simo*, 316 F.3d at 981 (internal citations omitted).

As a formal matter, a claim against an employer under § 301 and a claim against a union for breach of the duty of fair representation are two separate causes of action. *DelCostello*, 462 U.S. 151, 164. "Yet the two claims are inextricably interdependent. To prevail against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." *Id.* at 164-65 (internal quotations omitted) (ellipsis in original). This is because an employee is ordinarily bound by the outcome of grievance procedures outlined in the CBA according to the finality provisions in that agreement. *Id.* at 164. Normally, no judicial remedy lies – the grievance procedure under the CBA is the sole remedy. However, when a union has breached its duty of fair representation during the grievance process, courts have held that it would work an "unacceptable injustice" for an employee to be bound by its outcome. *Id.* In such cases, an employee may bring suit against both the union and the employer. *Id.*

UHW moves to dismiss Plaintiff's first claim on two grounds. It argues that the claim is time barred, and, in the alternative, that Plaintiff fails to establish sufficient factual allegations to state a claim under the Labor Management Relations Act (LMRA). If this claim is dismissed against the UHW, the LMRA claim against Kaiser must also be dismissed.

///
///
///

1. Claim for Wrongful Termination and Breach of Duty of Fair Representation is Timely

While there is no statutorily set statute of limitations for suits for wrongful termination and breach of duty of fair representation, the Supreme Court has held that the six-month statute of limitations from Section 10(b) of the National Labor Relations Act applies to these causes of action. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 154-55 (1983). Plaintiff filed her complaint on July 6, 2012. Thus, in order for her claim to be timely, it must have accrued after January 6, 2012. Plaintiff alleges that the UHW breached its duty through various actions both before and after this date. She alleges that the union breached its duty by (1) failing to adequately investigate false allegations and disciplinary actions Ms. Taylor and other Kaiser employees took against plaintiff after October 15, 2010; (2) failing to file grievances for retaliatory acts by Kaiser's agents between October 15, 2010 and Plaintiff's termination on July 7, 2011; (3) providing a copy of Plaintiff's grievance appeal to Ms. Taylor without Plaintiff's permission on April 13, 2011; (4) advising Plaintiff to sign the "last chance" agreement on July 7, 2011; (5) abandoning Plaintiff's termination grievance on January 12, 2012; and (6) thereafter failing to timely demand arbitration after it abandoned Plaintiff's grievance. Compl. ¶ 29, 31. As these events span the period before and after January 6, 2012, it is necessary to determine when in this sequence of events the statute of limitations began to run.

The six month period generally begins to run when the employee knows, or should know, of the alleged breach on the part of the union. *Galindo v. Stoody Co.*, 793 F.2d 1502, 1509 (9th Cir. 1986). In *Galindo*, the Ninth Circuit held that the limitations period is effectively tolled if an employee seeks to address the alleged breach through a grievance procedure or arbitration. 793 F.2d at 1509-10. This is because "[a]n employee should not be penalized for seeking to resolve his dispute through the grievance process before filing a suit in federal court." *Id.* A rule that did not allow for such tolling "would encourage the premature filing of duty of fair representation suits in lieu of resort to non-judicial grievance measures." *Id.*

The plaintiff in *Galindo* alleged that his union breached its duty by both failing to notify the employer of the plaintiff's seniority rights as a steward (which would likely have prevented him

9

1 from being laid off), and failing to properly prepare and present the plaintiff's case at arbitration.
2 *Galindo*, 793 F.2d at 1506, 1514. The plaintiff filed his suit within six months of the date that his
3 claim for the inadequate representation at arbitration accrued. *Id.* at 1509. By the time he filed suit,
4 however, more than six months had passed since the union's failure to notify the employer of his
5 status as a steward. *Id.* Since the failure to notify was one of the subjects of the arbitration
6 proceedings, however, the court held that the statute of limitations was tolled until the conclusion of
7 the arbitration proceedings. *Id.* at 1510-11. The court noted, however, that, "resort to the grievance
8 process should toll the limitations period only if the grievance is related to the alleged breach of duty
9 of fair representation." *Id.* at 1510 n.5. Despite the court's use of the term "tolling" in the decision,
10 the holding appears to actually be that the claim does not accrue until the arbitration concludes. In
11 calculating whether the plaintiff's suit was timely filed, the court did not consider the time before the
12 grievance was filed, as it would have if the grievance procedure merely tolled the limitations period.
13 *Id.* at 1507; *see also Zuniga v. United Can Co.*, 812 F.2d 443, 449 (9th Cir. 1987) (similarly not
14 considering time prior to grievance filing towards six month limitations period).

15 Following *Galindo*, a number of Ninth Circuit cases have held that when an employee
16 pursues a grievance, the employee's claim against the union for breach of the duty of fair
17 representation does not accrue until the union notifies the employee that it intends to abandon the
18 employee's grievance. In *Stallcop v. Kaiser Foundation Hospitals*, the Ninth Circuit held that an
19 employee's hybrid claim against her employer and union under the LMRA accrued when she
20 received notice from her union that it did not intend to further pursue her grievance. 820 F.2d 1044,
21 1049 (9th Cir. 1987). Similar to *Stallcop*, the Ninth Circuit in *Zuniga v. United Can Co.*, held that
22 an employee's cause of action against his union did not accrue until he received a letter from his
23 union informing him that it would not further pursue his grievance. 812 F.2d 443, 449 (9th Cir.
24 1987). In *Harper v. San Diego Transit Corp.*, the Ninth Circuit rejected an employee's argument
25 that the statute of limitations should be tolled because his union continued to breach its duty of fair
26 representation by continuing to refuse to bring a grievance on his behalf. 764 F.2d at 669. The

court held that "the date of accrual should . . . [be] measur[ed] . . . from the last day that both the Union and the employer could have finally resolved the dispute."[5] *Id.*

As Ms. Grotz, the Plaintiff in the case at bar, filed her suit within six months of the date she was notified that the union was abandoning her grievance, her claim was timely as to all alleged breaches that relate to her grievance. *See Galindo*, 793 F.2d at 1509-10, 1510 n.5. The grievance appealed her termination, which she alleges was retaliatory and based on false accusations of timecard fraud. Compl. ¶ 27-28. Accordingly, any alleged breach related to the UHW's representation of Plaintiff with regards to the allegations of timecard fraud is related to her grievance and thus timely. Alleged breaches relating to the UHW's failure to investigate *other* acts retaliation, or its handling of Plaintiff's appeal of the March 13, 2011 write up (which did not pertain to her termination), on the other hand, are not related to the grieved termination, and is thus not saved from untimeliness under *Galindo*.

This Court finds that Plaintiff filed suit within the statute of limitations as to her claim that the UHW breached its duty of fair representation in connection with the allegations of timecard fraud and her ensuing termination. Defendant UHW's motion to dismiss Plaintiff's claims as untimely is thus **DENIED** as to these claims, and **GRANTED** as to all other claims.

2. <u>Plaintiff has Stated a Claim for Breach of Duty of Fair Representation</u>

UHW argues that even if Plaintiff's claim for breach of duty of fair representation is not time barred, she fails to state allege facts sufficient to make out her claim. A union breaches its duty of fair representation only when it acts in a way that is "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). Mere negligence on the part of the union does not constitute a breach of duty. *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir. 1985). Good faith

---

[5] The parties cite additional cases that are largely unhelpful.

In *Harris v. Alumax Mill Products, Inc.*, 897 F.2d 400 (9th Cir. 1990), the court was faced with the question of whether the filing of a workers' compensation claim tolled the statute of limitations. It held that it did not because the workers' compensation claim was optional, and not part of a mandatory grievance system. It held that the employee's claim "accrued no later than" the date he was informed that the union would not be pursuing his grievance, but it does not discuss whether the claim accrued before that date. *Id.* at 404.

*Grant v. McDonnell Douglas Corp.*, 163 F.3d 1136 (9th Cir.1998) deals with tolling the statute of limitations when the employee is mentally incompetent, and has no relevance here.

11

errors in judgment do not constitute a breach of duty because "unions must retain wide discretion to act in what they perceive to be their members' best interests." *Id.* The Ninth Circuit has "emphasized that, because a union balances many collective and individual interests in deciding whether and to what extent it will pursue a particular grievance, courts should 'accord substantial deference' to a union's decisions regarding such matters." *Id.*; *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1273 (9th Cir. 1983). However, courts "may decline to give a union the deference owed to an exercise of judgment only where union actions or inactions are 'so far outside a wide range of reasonableness that [they are] wholly irrational or arbitrary.'" *Beck v. United Food & Commercial Workers' Union*, 506 F.3d 874, 879 (9th Cir. 2007) (quoting *Airline Pilots Ass'n v. O'Neill*, 499 U.S. 65, 78 (1991)).

"A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998). In attempting to clarify the line between mere negligence and arbitrary action that rises to the level of a breach of the union's duty, the court in *Peterson* noted that:

> There are some significant general principles that emerge from our previous decisions. In all cases in which we found a breach of the duty of fair representation based on a union's arbitrary conduct, it is clear that the union failed to perform a procedural or ministerial act, that the act in question did not require the exercise of judgment and that there was no rational and proper basis for the union's conduct. For example, we found a union acted arbitrarily where it failed to: (1) disclose to an employee its decision not to submit her grievance to arbitration when the employee was attempting to determine whether to accept or reject a settlement offer from her employer; (2) file a timely grievance after it had decided that the grievance was meritorious and should be filed; (3) consider individually the grievances of particular employees where the factual and legal differences among them were significant; or (4) permit employees to explain the events which led to their discharge before deciding not to submit their grievances to arbitration.

*Peterson*, 771 F.2d at 1254 (internal citations omitted). The Ninth Circuit has since noted that the categories of ministerial and discretionary acts outlined in *Peterson* "represent not absolute categories without relation to one another but opposing points on a continuum." *Peters v. Burlington Northern R. Co.*, 931 F.2d 534, 539 (9th Cir. 1990).

A union's actions may constitute arbitrary conduct if it simply ignores a meritorious claim or gives it only perfunctory handling, if it fails to conduct even a minimal investigation of a grievance, or if its actions evince "reckless disregard" for the rights of the employee. *Peterson*, 771 F.2d at 1254. A union must conduct at least some minimal investigation of grievances brought to its attention. *Diaz v. Intern'l Longshore & Warehouse Union, Local 13*, 474 F.3d 1202, 1207 (9th Cir. 2007); *Tenorio v. NLRB*, 680 F.2d 598, 601 (9th Cir. 1982). While an employee does not have an absolute right to have his grievance taken to arbitration, a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion. *Vaca*, 386 U.S. at 191.

In the case at bar, the fact that the UHW declined to pursue Plaintiff's grievance after January 12, 2012 is not by itself a breach of its duty of fair representation. *See Vaca*, 386 U.S. at 191-92. This is so even if the decision constituted an error in judgment, as unions have broad discretion in processing grievances. *Peterson*, 771 F.2d at 1253. To overcome this motion to dismiss, Plaintiff must allege that the handling of her grievance was in bad faith or arbitrary.

Plaintiff offers several specific allegations to support her argument that the UHW breached its duty by handling her grievance in a perfunctory manner. *See Peterson*, 771 F.2d at 1254. First, she alleges that the UHW failed to make reasonable efforts to secure documentation related to her timecards to rebut the allegations against her. Compl. ¶ 30. As Plaintiff was facing discipline because of allegedly fraudulent timecard entries, even a perfunctory investigation arguably required that the union examine the records on which the allegations were based, especially since she alleges that she had no prior disciplinary problems, that Ms. Taylor had engaged in a pattern of retaliatory conduct, and that Ms. Taylor had access to her time records. Yet Plaintiff was not permitted to view the timecard records herself and the union never tried to secure them for examination. *See* Compl. ¶ 19. Second, throughout the grievance process, the union did not raise the issue of retaliation. Compl. ¶ 18, 28. Nor was Plaintiff permitted to raise the issue. Third, two union representatives encouraged Plaintiff to sign a "last chance" agreement, despite the fact Plaintiff told them that it contained false statements, and the fact that one of them had not read it. Compl. ¶ 23, 31. Fourth, Plaintiff was not permitted to talk at the Step II meeting about her grievance, and she did not participate in the Step III grievance proceedings, contrary to the terms of the CBA. Compl. ¶ 28;

13

Compl. Ex. 3 at 121. Finally, several union representatives were "openly hostile towards the plaintiff and/or indifferent" during the course of the investigation (Compl. ¶ 30).

Plaintiff has alleged for purposes of this motion to dismiss sufficient facts to make a claim that the UHW's investigation of her grievance was merely perfunctory, indeed virtually non-existent, and that its action evinced a "reckless disregard" of Plaintiff's rights. *Peterson*, 771 F.2d at 1254; *Diaz*, 474 F.3d at 1207; *Tenorio*, 680 F.2d at 601.

Accordingly, the UHW's motion to dismiss Plaintiff's claim for failure to state a claim is **DENIED.** Likewise, Kaiser's motion to dismiss the LMRA claim is also **DENIED**.

B.  Plaintiff's Claim for Negligent Infliction of Emotional Distress

Defendant Kaiser moves to dismiss Plaintiff's claim for negligent infliction of emotional distress, arguing that it fails as a matter of law because the supervisory conduct on which it is based is "inherently intentional" under California law. In the alternative, Kaiser argues that to the degree that the claim is based on its negligent acts, the claim is preempted by California's workers' compensation scheme. Plaintiff opposes both grounds for the motion. As the Court finds this later argument correct, it does not reach the first argument.

1.  Plaintiff's NIED Claim is Preempted by California's Workers' Compensation Scheme

Kaiser argues that if Plaintiff's NIED claim is based on negligent acts, that it is barred by the California workers' compensation scheme, which is the exclusive remedy for injuries caused by employer negligence. Kaiser Mot. Dismiss at 8; Cal. Labor Code § 3202 *et seq.*

Under California law, both physical and emotional injuries sustained in the course of employment are pre-empted by the state workers' compensation scheme and generally will not support an independent cause of action. *See Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148, 160, 729 P.2d 743 (1987). Emotional injuries caused by workplace discipline, including termination, fall within this rule. *Id.; Shoemaker v. Myers*, 52 Cal. 3d 1, 7, 801 P.2d 1054 (1990). In *Cole*, the California Supreme Court held that

> when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations

> as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability.

*Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148, 160, 729 P.2d 743 (1987). Such claims for infliction of emotional distress are preempted by worker's compensation even where the emotional distress did not result in any physical injury or compensable disability. *Livitsanos v. Superior Court*, 2 Cal. 4th 744, 747, 828 P.2d 1195, 1197 (1992).

A number of cases have found exceptions to this general rule of preemption, where an employer's conduct exceeds the risks inherent in the employment relationship or where the employer's actions are in violation of a fundamental public policy of the state of California. *See, e.g.*, *Gantt v. Sentry Insurance*, 1 Cal. 4th 1083, 1100 (Cal. 1992); *Maynard v. City of San Jose*, 37 F.3d 1396 (9th Cir. 1994); *Accardi v. Superior Court*, 17 Cal. App. 4th 341, 345 (Cal. App. 1993); *Murray v. Oceanside Unified School Dist.*, 79 Cal. App. 4th 1338, 1363 (Cal. App. 2000). A recent California Supreme Court case, however, clarified these exceptions in the context of whistleblower retaliation cases. Its holding makes clear that neither exception applies here.

In *Miklosy v. Regents of University of California*, the Court held that the exception to workers' compensation preemption for employer "conduct that 'contravenes fundamental public policy' is aimed at permitting a *Tameny* action [for wrongful discharge in violation of public policy] to proceed despite the workers' compensation exclusive remedy rule." 44 Cal. 4th 876, 902 (Cal. 2008) (internal citations omitted). This exception does not, however, allow a "distinct cause of action, not dependent upon the violation of an express statute or violation of fundamental public policy." *Id.* (quoting *Shoemaker*, 52 Cal.3d at 25, 276 Cal. Rptr. 303, 801 P.2d 1054). Here, Plaintiff's *Tameny* claim for wrongful termination of public policy, if proven, may not be preempted by workers' compensation. Her independent claim for negligent infliction of emotional distress, however, is preempted unless it falls within the second exception recognized in *Miklosy* – where the conduct "exceeds the risk inherent in the employment relationship."

The *Miklosy* Court reaffirmed the holding in *Shoemaker v. Myers* that the exception for employer conduct that "exceeds the risks inherent in the employment relationship" normally does

*not* apply to emotional distress claims based on whistleblower retaliation. *Miklosy*, 44 Cal. 4th at 903. In *Shoemaker*, involving emotional distress claims arising out of an allegedly retaliatory termination, the Court had held that such emotional distress claims were preempted by worker's compensation. 52 Cal. 3d 1, 25 (Cal. 1990). *Shoemaker* reasoned that "[t]he kinds of conduct at issue (e.g., discipline or criticism) are a normal part of the employment relationship. Even if such conduct may be characterized as intentional, unfair or outrageous, it is nevertheless covered by the workers' compensation exclusivity provisions." *Id.* Plaintiff's allegations here concern Kaiser's alleged misconduct in the course of handling her workplace grievances, disciplining her, and ultimately firing her. As all of the alleged misconduct arose in the context of her employment relationship, her claims fall squarely within the kind of conduct that *Cole*, *Shoemaker*, and *Miklosy* found to be pre-empted by workers' compensation.

Accordingly, Kaiser's motion to dismiss Plaintiff's claim for negligent infliction of emotional distress as preempted by workers' compensation is **GRANTED.**[6]

C. <u>Kaiser's Motion to Strike Portions of Plaintiff's IIED Claim</u>

Kaiser moves to strike portions of Plaintiff's claim for intentional infliction of emotional distress to the degree that it is based on her alleged termination "without just cause," arguing that any such claim would be preempted by the LMRA because it would require interpretation of the CBA. Kaiser's Mot. Dismiss at 9. Plaintiff concedes that the inclusion of this language would render the claim preempted by the LMRA, and requests leave to strike the language from the complaint, and to file an amended complaint "if necessary." Pl's Resp. to Kaiser's Mot. Dismiss at 13.

The parties are correct that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). On the other hand, where state law

---

[6] While Kaiser does not raise its preemption argument with regards to Plaintiff's IIED claim, the relevant cases do not distinguish between NIED in and IIED, suggesting that the IIED claim may also be preempted by the state workers' compensation scheme. Indeed, both *Miklosy* and *Shoemaker* dealt with IIED claims rather than NIED claims. *Miklosy*, 44 Cal. 4th at 903; *Shoemaker*, 52 Cal. 3d at 25.

claims for the infliction of emotional distress are based on allegations of retaliatory firing and the resolution of the claims does not require interpretation of the CBA, the claims are not pre-empted. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407-10 (1988).

Without striking the just cause language, Plaintiff's IIED claim would require interpreting the just cause termination provisions of Plaintiff's CBA. When that language is struck, Plaintiff's claim does not require interpretation of the CBA. As striking the language would address the LMRA preemption problem and it is unopposed, the Court **GRANTS** Kaiser's motion to strike the phrase "without just cause" from ¶ 43 of Plaintiff's claim for intentional infliction of emotional distress.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant UHW's motion to dismiss the first cause of action, **DENIES** Defendant Kaiser's motion to dismiss the LMRA claim, **GRANTS** Defendant Kaiser's motion to dismiss Plaintiff's negligent infliction of emotional distress claim with prejudice, and **GRANTS** Defendant Kaiser's motions to strike portions of Plaintiff's claim for intentional infliction of emotional distress.

This order disposes of Docket Nos. 8 and 14.

IT IS SO ORDERED.

Dated: October 29, 2012

_____
EDWARD M. CHEN
United States District Judge

17